Elaine A. Ryan (AZ Bar #012870)
**AUER RYAN, P.C.**
20987 N. John Wayne Parkway, #B104-374
Maricopa, AZ 85139
Telephone : (520) 705-7332
eryan@auer-ryan.com

Norman E. Siegel*
J. Austin Moore*
Stefon J. David*
**STUEVE SIEGEL HANSON LLP**
460 Nichols Road, Suite 200
Kansas City, Missouri 64112
Telephone: (816) 714-7100
siegel@stuevesiegel.com
moore@stuevesiegel.com
david@stuevesiegel.com
*Pro Hac Vice Forthcoming*

*Counsel for Plaintiffs and the Class*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| David Baehr and Marilyn Zajacka, individually and on behalf of all others similarly situated,<br><br>                    Plaintiffs,<br><br>v.<br><br>Medical Management Resource Group, LLC d/b/a American Vision Partners,<br><br><br>                    Defendant. | CASE NO.:<br><br>JURY TRIAL DEMANDED |

## <u>CLASS ACTION COMPLAINT</u>

Plaintiffs David Baehr and Marilyn Zajacka ("Plaintiffs"), by and through the undersigned counsel, bring this class action complaint against Defendant Medical Management Resource Group, LLC d/b/a American Vision Partners ("American Vision" or "Defendant") on behalf of

themselves and all others similarly situated. Plaintiffs make the following allegations based upon personal knowledge as to their own actions and upon information and belief as to all other matters:

## NATURE OF THE ACTION

1.     On February 6, 2023, American Vision, an Arizona-based ophthalmologist practices management company partnering with practices across five states disclosed that it was the subject of a massive data breach whereby hackers gained unauthorized access to its networks in Fall 2023 (the "Data Breach"). On information and belief, the Data Breach impacted over 2.3 million individuals who received care from any of American Vision's 14 facilities.

2.     According to its website, American Vision partners with 12 ophthalmologist practices, including Barnet Dulaney Perkins Eye Center and Southwestern Eye Center (the "Partnership").  Under the Partnership, Barnet and Southwestern share patients' highly sensitive personal health information and other data with American Vision.

3.     During the Data Breach, hackers accessed, copied, and exfiltrated highly sensitive information stored on American Vision's servers, including names, contact information, dates of birth, certain medical information (e.g., services received, clinical records, and medications), Social Security numbers, and insurance information ("PHI").[1]

4.     American Vision is responsible for the Data Breach because it failed to implement reasonable security procedures and practices, failed to disclose material facts surrounding its deficient security protocols, and failed to timely notify the victims of the Data Breach.

5.     As a result of American Vision's failure to protect the sensitive information it was entrusted to safeguard, Plaintiffs and Class members did not receive the benefit of their bargain with Defendants and now face a significant risk of medical-related theft and fraud, financial fraud, and other identity-related fraud now and into the indefinite future.

## PARTIES

6.     Plaintiff David Baehr is a resident of Tucson, Arizona and patient of Barnet whose PHI was exfiltrated from American Vision.

---

[1] *MMRG Notifies Patients of Cybersecurity Incident*, BUSINESS WIRE (Feb. 6, 2024, 5:30 PM), https://www.businesswire.com/news/home/20240206060527/en/.

7.     Plaintiff Marilyn Zajacka is a resident of Sierra Vista, Arizona and patient of Southwestern Eye Center whose PHI was PHI was exfiltrated from American Vision.

8.     Defendant Medical Management Resource Group, LLC d/b/a American Vision Partners is an ophthalmologist practice management company that is registered in Arizona with its principal place of business in Maricopa County, Arizona.

## JURISDICTION AND VENUE

9.     This Court has subject matter jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). The amount in controversy exceeds $5 million exclusive of interest and costs. There are more than 100 putative class members and at least some members of the proposed Class have a different citizenship from Defendant. This Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367 because all claims alleged herein form part of the same case or controversy.

10.     This Court has jurisdiction over American Vision because it maintains and operates its headquarters in this District. American Vision is also authorized to and does conduct business in this District and is subject to general personal jurisdiction in this State.

11.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) (1) & (2) because American Vision resides in this District and a substantial part of the events and omissions giving rise to this action occurred in this District.

## FACTUAL ALLEGATIONS

### *American Vision's Privacy Practices*

12.     American Vision is an ophthalmologist management company that partners with "the most respected ophthalmology practices in the country" and integrates "a best-in-class management system, infrastructure and technology to provide the highest-quality patient care."[2]

13.     As part of the Partnership, American Vision collects patients' protected health information from its partners, like Barnet and Southwestern. This includes patients' full names, contact information, dates of birth, certain medical information (e.g., services received, clinical

---

[2] *Homepage*, AMERICAN VISION PARTNERS, https://americanvisionpartners.com/ (last visited Feb. 22, 2024).

records, and medications), Social Security numbers, and insurance information. American Vision then stores this highly sensitive information on its centralized servers.

14.     As a result, patients do not voluntarily provide their PHI to American Vision, but rather, American Vision obtains their information from its partners, like Barnet and Southwestern.

15.     Given the amount and sensitive nature of the data it collects, under HIPAA, American Vision must maintain a "Notice of Privacy Practices," which describes how confidential patient information is used and disclosed.  Upon a review of American Vision's website, the only reference to a "Notice of Privacy Practices" is on its privacy policy webpage: "For more information about these rights, please see the detailed Notice of Privacy Practices."[3] Still, after reviewing the "Notices" webpage, the only two notices provided are the "Policy on Non-Discrimination" and "Your Rights and Protections Against Surprise Medical Bills."[4]

16.      In this Notice of Privacy Practices, which American Vision recently removed from its website, American Vision represents that: "Your medical information is personal. American Vision Partners and all of their affiliates . . . and its employees are dedicated to maintaining the privacy of personal your health information . . . as required by applicable federal and state laws."[5] American Vision also promised that it would "not disclose [patients'] PHI without [their] written authorization," except in limited circumstances that do not apply.[6]

17.     Given its representations and experience handling highly sensitive PHI, American Vision understood the need to protect patients' PHI and prioritize data security.

### *The Data Breach*

18.     On November 16, 2023, American Vision detected unauthorized activity in its internal network. During that time, American Vision learned that hackers infiltrated its networks. American Vision "promptly took steps to contain" the unauthorized activity, and it "launched an investigation with the assistance of leading third-party cybersecurity firms and coordinated with

---

[3] *Privacy Policy*, AMERICAN VISION PARTNERS, https://americanvisionpartners.com/privacy-policy/ (last visited Feb. 22, 2024).
[4] *Notices*, AMERICAN VISION PARTNERS, https://americanvisionpartners.com/notices/ (last visited Feb. 22, 2024).
[5] *HIPAA Notice of Privacy Practices*, INTERNET ARCHIVE WAYBACK MACHINE, https://web.archive.org/web/20230208043537/https://americanvisionpartners.com/notices/privacy-policy/ (last visited Feb. Feb. 22, 2024).
[6] *Id.*

law enforcement." A few weeks later, American Vision learned that hackers accessed and exfiltrated highly sensitive patient information stored on its servers.  To date, American Vision's limited disclosures do not identify the temporal scope or cause of the Data Breach.

19.     The investigation confirmed that extensive personal medical information was accessed and copied, including patients' full names, contact information, dates of birth, certain medical information (e.g., services received, clinical records, and medications), Social Security numbers, and insurance information.

20.     A disclosure by American Vision to the Department of Health and Human Services revealed that the breach impacted 2,350,236 patients. Though American Vision allegedly first learned of the breach in November 2023, it only began contacting patients three months later.

The Data Breach was Preventable

21.     American Vision's cybersecurity practices and policies were inadequate and fell short of the industry-standard measures that should have been implemented long before the Data Breach occurred. This is especially true given that the healthcare industry is frequently one of the most targeted sectors for cyberattacks and attacks using stolen credentials have increased precipitously over the last several years.

22.     Healthcare providers and their affiliates like American Vision are prime targets because of the information they collect and store, including financial information of patients, login credentials, insurance information, medical records and diagnoses, and personal information of employees and patients—all extremely valuable on underground markets.

23.     This was known and obvious to American Vision as it observed frequent public announcements of data breaches affecting healthcare providers and knew that information of the type it collected, maintained, and stored is highly coveted and a frequent target of hackers.

24.     The Department of Health and Human Services (HHS) recently disclosed that in 2023 alone more than 88 million individuals have been subjected to healthcare-related data breaches, a staggering 60% increase from the prior year.[7]

---

[7] *HHS' Office for Civil Rights Settles Ransomware Cyber-Attack Investigation*, HHS, https://www.hhs.gov/about/news/2023/10/31/hhs-office-civil-rights-settles-ransomware-cyber-attack-investigation.html (last visited Feb. 22, 2024).

25. It is well known that use of stolen credentials through long been the most popular and effective method of gaining authorized access to a company's internal networks and that companies should activate defenses to prevent such attacks.

26. According to the Federal Bureau of Investigation (FBI), phishing schemes designed to induce individuals to reveal personal information were the most common type of cybercrime in 2020, with such incidents nearly doubling in frequency between 2019 and 2020.[8] According to Verizon's 2021 Data Breach Investigations Report, 43% of breaches stemmed from phishing and/or pretexting schemes.[9]

27. The risk is so prevalent for healthcare providers that on October 28, 2020, the FBI and two federal agencies issued a "Joint Cybersecurity Advisory" warning that they have "credible information of an increased and imminent cybercrime threat to U.S. hospitals and healthcare providers."[10] The Cybersecurity and Infrastructure Security Agency (CISA), the Department of Health and Human Services (HHS), and the FBI issued the advisory to warn healthcare providers to take "timely and reasonable precautions to protect their networks from these threats."[11]

28. There are two primary ways to mitigate the risk of stolen credentials: user education and technical security barriers. User education is the process of making employees or other users of a network aware of common disclosure schemes and implementing company-wide policies requiring the request or transfer of sensitive personal or financial information only through secure sources to known recipients.

29. From a technical perspective, companies can also greatly reduce the flow of fraudulent e-mails by installing software that scans all incoming messages for harmful attachments or malicious content and implementing certain security measures governing e-mail transmissions, including Sender Policy Framework (SPF) (e-mail authentication method used to prevent

---

[8] *2020 Internet Crime Report*, FBI, https://www.ic3.gov/Media/PDF/AnnualReport/2020_IC3Report.pdf (last visited Feb. 22, 2024).
[9] *2021 DBIR Master's Guide*, VERIZON, https://www.verizon.com/business/resources/reports/dbir/2021/masters-guide/ (subscription required) (last visited Feb. 22, 2024).
[10] *Ransomware Activity Targeting the Healthcare and Public Health Sector*, JOINT CYBERSECURITY ADVISORY, https://us-cert.cisa.gov/sites/default/files/publications/AA20-302A_Ransomware%20_Activity_Targeting_the_Healthcare_and_Public_Health_Sector.pdf (last visited Feb. 22, 2024).
[11] *Id.*

spammers from sending messages on behalf of a company's domain), DomainKeys Identified Mail (DKIM) (e-mail authentication method used to ensure messages are not altered in transit between the sending and recipient servers), and Domain-based Message Authentication, Reporting and Conformance (DMARC), which "builds on the widely deployed [SPF] and [DKIM] protocols, adding a reporting function that allows senders and receivers to improve and monitor protection of the domain from fraudulent email."[12]

30.     Additionally, because the goal of these schemes is to gain an employee's login credentials in order to access a company's network, there are industry-standard measures that companies can implement to greatly reduce unauthorized access, even if an individual's login credentials are disclosed, such as multi-factor authentication (a security system that requires more than one method of authentication from independent categories of credentials to verify the user's identity for a login). Thus, even if hackers obtain an employee's username and password, access to the company's system is thwarted because they do not have access to the additional authentication methods.

31.     Similarly, companies housing sensitive data must implement adequate "network segmentation," which is the practice of dividing a larger network into several smaller subnetworks that are each isolated from one another to provide enhanced security. For example, hackers that gain access to an unsegmented network (commonly through phishing) can move laterally across the network to access databases containing valuable assets such as sensitive personal information or financial records. Malicious lateral movement can be difficult to detect because it oftentimes appears as normal network traffic. By implementing adequate network segmentation, companies can prevent even those hackers who already gained a foothold in their network from moving across databases to access their most sensitive data.

32.     Network segmentation is commonly used in conjunction with the principle of least privilege (POLP), which is a security practice that limits employees' privileges to the minimum necessary to perform the job or task. In an IT environment, adhering to POLP reduces the risk of hackers gaining access to critical systems or sensitive data by compromising a low-level user

---

[12] *Id.*

account, device, or application.[13] In an example given by security software provider Digital Guardian:

> [A]n employee whose job is to enter info into a database only needs the ability to add records to that database. If malware infects that employee's computer or if the employee clicks a link in a phishing email, the malicious attack is limited to making database entries. If that employee has root access privileges, however, the infection can spread system-wide.[14]

This is precisely why approximately 67% of targeted malware and stolen credential schemes are directed at individual contributors and lower-level management personnel.[15]

33.    In addition to mitigating the risk of stolen credentials, the CISA guidance encourages organizations to prevent unauthorized access by:

- Conducting regular vulnerability scanning to identify and address vulnerabilities, particularly on internet-facing devices;

- Regularly patching and updating software to latest available versions, prioritizing timely patching of internet-facing servers and software processing internet data;

- Ensuring devices are properly configured and that security features are enabled;

- Employing best practices for use of Remote Desktop Protocol (RDP) as threat actors often gain initial access to a network through exposed and poorly secured remote services; and

- Disabling operating system network file sharing protocol known as Server Message Block (SMB) which is used by threat actors to travel through a network to spread malware or access sensitive data.[16]

34.    The CISA guidance further recommends use of a centrally managed antivirus software utilizing automatic updates that will protect all devices connected to a network (as

---

[13] Nate Lord, *What is the Prinicple of Least Privilge (POLP)?*, DIGITAL GUARDIAN (May 6, 2023), https://digitalguardian.com/blog/what-principle-least-privilege-polp-best-practice-information-security-and-compliance.

[14] *Id.*

[15] *Jessica Davis, Pharmaceutical Companies Most Targeted Industry by Cybercriminals*, HEALTH IT SECURITY (Nov. 30, 2018), https://web.archive.org/web/20230102100837/https://healthitsecurity.com/news/pharmaceutical-companies-most-targeted-industry-by-cybercriminals.

[16] CISA Guide at 4.

opposed to requiring separate software on each individual device), as well as implementing a real-time intrusion detection system that will detect potentially malicious network activity that occurs prior to ransomware deployment.[17]

35.     Despite holding the PHI of millions of patients, American Vision failed to adhere these recommended best practices. Indeed, had American Vision implemented common sense security measures like network segmentation and POLP, the hackers never could have accessed millions of patient files and the breach would have been prevented or much smaller in scope. American Vision also lacked the necessary safeguards to detect and prevent phishing attacks and failed to implement adequate monitoring or control systems to detect the unauthorized infiltration after it occurred.

36.     American Vision, like any entity in the healthcare industry its size storing valuable data, should have had robust protections in place to detect and terminate a successful intrusion long before access and exfiltration could expand to millions of patient files. American Vision's below-industry-standard procedures and policies is inexcusable given its knowledge that it was a prime target for cyberattacks.

***Allegations Relating to Plaintiff David Baehr***

37.     Plaintiff David Baehr lives and resides in Tucson, Arizona and is a current healthcare patient of Barnet, an ophthalmologist practice partnering with American Vision.

38.     For purposes of receiving medical treatment, Mr. Baehr was required to provide his healthcare provider with his sensitive personal information, including, among other information, his full name, contact information, date of birth, Social Security number, and health insurance information.

39.     Mr. Baehr's healthcare provider also maintained his patient account numbers, health insurance information, medical record numbers, dates of service, provider names, and medical and clinical treatment information.

40.     Mr. Baehr's healthcare provider shared Mr. Baehr's PHI with American Vision in connection with his treatment.

---

[17] *Id.* at 5.

41.     In February 2023, Mr. Baehr received a notification letter from American Vision stating that he was a victim of the Data Breach. The letter stated, "[w]e are writing on behalf of the Practices to notify you of a cybersecurity incident that involves certain of your personal information we maintain in connection with performing services for the Practices."

42.     The letter recommended that Mr. Baehr take certain actions like monitoring financial accounts and credit reports for suspicious activity to detect errors. Furthermore, the letter recommended that Mr. Baehr place a "fraud alert" or "security freeze," if not both, on his credit report to detect any possible misuse of personal information.

43.     As a result of the Data Breach, Mr. Baehr has spent time and effort researching the breach and reviewing his financial and medical account statements for evidence of unauthorized activity, which he will continue to do indefinitely. Mr. Baehr also suffered emotional distress knowing that his highly personal medical and treatment information is no longer confidential and can be used for blackmail, extortion, medical-related identity theft or fraud, and any number of additional harms against him for the rest of his life.

### Allegations Relating to Plaintiff Marilyn Zajacka

44.     Plaintiff Marilyn Zajacka lives and resides in Sierra Vista, Arizona and is a current healthcare patient of Southwestern, an ophthalmologist practice partnering with American Vision.

45.     For purposes of receiving medical treatment, Ms. Zajacka was required to provide her healthcare provider with her sensitive personal information, including, among other information, her full name, contact information, date of birth, Social Security number, and health insurance information.

46.     Ms. Zajacka's healthcare provider also maintained her patient account numbers, health insurance information, medical record numbers, dates of service, provider names, and medical and clinical treatment information.

47.     Ms. Zajacka's healthcare provider shared Ms. Zajacka's PHI with American Vision in connection with her treatment.

48.     In February 2023, Ms. Zajacka received a notification letter from American Vision stating that she was a victim of the Data Breach. The letter stated, "[w]e are writing on behalf of

the Practices to notify you of a cybersecurity incident that involves certain of your personal information we maintain in connection with performing services for the Practices."

49.     The letter recommended that Ms. Zajacka take certain actions like monitoring financial accounts and credit reports for suspicious activity to detect errors. Furthermore, the letter recommended that Ms. Zajacka place a "fraud alert" or "security freeze," if not both, on her credit report to detect any possible misuse of personal information.

50.     As a result of the Data Breach, Ms. Zajacka has spent time and effort researching the breach and reviewing her financial and medical account statements for evidence of unauthorized activity, which she will continue to do indefinitely. Ms. Zajacka also suffered emotional distress knowing that her highly personal medical and treatment information is no longer confidential and can be used for blackmail, extortion, medical-related identity theft or fraud, and any number of additional harms against her for the rest of her life.

***American Vision Failed to Comply with Federal Law and Regulatory Guidance***

51.     American Vision is a healthcare provider covered by the Health Insurance Portability and Accountability Act of 1996 ("HIPAA") (*see* 45 C.F.R. § 160.102) and as such is required to comply with the HIPAA Privacy Rule and Security Rule, 45 C.F.R Part 160 and Part 164, Subparts A and E ("Standards for Privacy of Individually Identifiable Health Information"), and Security Rule ("Security Standards for the Protection of Electronic Protected Health Information"), 45 C.F.R. Part 160 and Part 164, Subparts A and C.

52.     These rules establish national standards for the protection of patient information, including PHI, defined as "individually identifiable health information" which either "identifies the individual" or where there is a "reasonable basis to believe the information can be used to identify the individual," that is held or transmitted by a healthcare provider. 45 C.F.R. § 160.103.

53.     HIPAA limits the permissible uses of "protected health information" and prohibits unauthorized disclosures of "protected health information."[18]

---

[18] 45 C.F.R. § 164.502.

54.   HIPAA requires that American Vision implement appropriate safeguards for this information.[19]

55.   HIPAA requires that American Vision provide notice of a breach of unsecured protected health information, which includes protected health information that is not rendered unusable, unreadable, or indecipherable to unauthorized persons—*i.e.* non-encrypted data.[20]

56.   Despite these requirements, American Vision failed to comply with its duties under HIPAA and its own Notice of Privacy Practices. Indeed, American Vision failed to:

   a.   Maintain an adequate data security system to reduce the risk of data breaches and cyberattacks;

   b.   Adequately protect the PHI of its patients and employees;

   c.   Ensure the confidentiality and integrity of electronically protected health information created, received, maintained, or transmitted, in violation of 45 C.F.R. § 164.306(a)(1);

   d.   Implement technical policies and procedures for electronic information systems that maintain electronically protected health information to allow access only to those persons or software programs that have been granted access rights, in violation of 45 C.F.R. § 164.312(a)(1);

   e.   Implement adequate policies and procedures to prevent, detect, contain, and correct security violations, in violation of 45 C.F.R. § 164.308(a)(1)(i);

   f.   Implement adequate procedures to review records of information system activity regularly, such as audit logs, access reports, and security incident tracking reports, in violation of 45 C.F.R. § 164.308(a)(1)(ii)(D);

   g.   Protect against reasonably anticipated uses or disclosures of electronic protected health information that are not permitted under the privacy rules regarding individually identifiable health information, in violation of 45 C.F.R. § 164.306(a)(3);

[19] 45 C.F.R. § 164.530(c)(1).
[20] 45 C.F.R. § 164.404; 45 C.F.R. § 164.402.

h.  Ensure compliance with the electronically protected health information security standard rules by their workforces, in violation of 45 C.F.R. § 164.306(a)(4); and/or

i.  Train all members of their workforces effectively on the policies and procedures with respect to protected health information as necessary and appropriate for the members of their workforces to carry out their functions and to maintain security of protected health information, in violation of 45 C.F.R. § 164.530(b).

57.    Additionally, federal agencies have issued recommendations and guidelines to help minimize the risks of a data breach for businesses holding sensitive data. For example, the Federal Trade Commission ("FTC") has issued numerous guides for business highlighting the importance of reasonable data security practices, which should be factored into all business-related decision making.[21]

58.    The FTC's publication *Protecting Personal Information: A Guide for Business* sets forth fundamental data security principles and practices for businesses to implement and follow as a means to protect sensitive data.[22] Among other things, the guidelines note that businesses should (a) protect the personal customer information that they collect and store; (b) properly dispose of personal information that is no longer needed; (c) encrypt information stored on their computer networks; (d) understand their network's vulnerabilities; and (e) implement policies to correct security problems. The FTC guidelines further recommend that businesses use an intrusion detection system, monitor all incoming traffic for unusual activity, monitor for large amounts of data being transmitted from their system, and have a response plan ready in the event of a breach.[23]

59.    Additionally, the FTC recommends that companies limit access to sensitive data, require complex passwords to be used on networks, use industry-tested methods for security; monitor for suspicious activity on the network, and verify that third-party service providers have

---

[21] *Start with Security*, FTC, https://www.ftc.gov/system/files/documents/plain-language/pdf0205-startwithsecurity.pdf (last visited Feb. 22, 2024).

[22] *Protecting Personal Information*, FTC, https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf (last visited Feb. 22, 2024).

[23] *Id*.

implemented reasonable security measures.[24] This is consistent with guidance provided by the FBI, HHS, and the principles set forth in the CISA 2020 guidance.

60. The FTC has brought enforcement actions against businesses for failing to reasonably protect customer information, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.[25]

61. American Vision was fully aware of its obligation to implement and use reasonable measures to protect the PHI of the patients but failed to comply with these basic recommendations and guidelines that would have prevented this breach from occurring. American Vision's failure to employ reasonable measures to protect against unauthorized access to patient information constitutes an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45.

### *The Impact of the Data Breach on Victims*

62. The PHI exposed in the Data Breach is highly coveted and valuable on underground markets as it can be used to commit medical-related identity theft and fraud, one of the most dangerous and costly forms of identity theft.

63. According to a *Reuters* investigation that included interviews with nearly a dozen healthcare executives, cybersecurity investigators, and fraud experts, medical data for sale on underground markets "includes names, birth dates, policy numbers, diagnosis codes and billing information" which fraudsters commonly use "to create fake IDs to buy medical equipment or drugs that can be resold, or they combine a patient number with a false provider number and file made-up claims with insurers."[26]

---

[24] *Start With Security*, *supra* note 22.

[25] *Privacy and Security Enforcement*, FTC, https://www.ftc.gov/news-events/media-resources/protecting-consumer-privacy/privacy-security-enforcement (last visited Feb. 22, 2024).

[26] Caroline Humer & Jim Finkle, *Your medical record is worth more to hackers than your credit card*, REUTERS (Sep. 24, 2014, 1:44 PM), .https://www.reuters.com/article/us-cybersecurity-hospitals/your-medical-recordis-worth-more-to-hackers-than-your-credit-card-idUSKCN0HJ21I20140924.

64.     According to Tom Kellermann, chief cybersecurity officer of cybersecurity firm Carbon Black, "Health information is a treasure trove for criminals [because] by compromising it, by stealing it, by having it sold, you have seven to 10 personal identifying characteristics of an individual."[27] For this reason, a patient's full medical records can sell for up to $1,000 on the dark web, while credit card numbers and Social Security numbers may cost $5 or less.[28]

65.     As noted by Paul Nadrag, a software developer for medical device integration and data technology company Capsule Technologies: "The reason for this price discrepancy—like any other good or service—is perceived value. While a credit card number is easily canceled, medical records contain a treasure trove of unalterable data points, such as a patient's medical and behavioral health history and demographics, as well as their health insurance and contact information. Once records are stolen, cybercriminals often tap into members of a criminal network on the dark web experienced in drug trafficking and money laundering who are eager to buy medical records to support their criminal activities, such as illegally obtaining prescription medications, filing bogus medical claims or simply stealing the patient's identity to open credit cards and fraudulent loans."[29]

66.     Indeed, while federal law generally limits an individual's liability for fraudulent credit card charges to $50, there are no such protections for a stolen medical identity. According to a 2015 survey on medical identity theft conducted by the Ponemon Institute, victims of medical identity theft spent an average of $13,500 in out-of-pocket costs to resolve the crime.[30] Frequently, this information was used to obtain medical services or treatments (59%), obtain prescription drugs (56%), or receive Medicare and Medicaid benefits (52%). Only 14% of respondents said that the

---

[27] Andrew Steger, *What Happens to Stolen Healthcare Data?*, HEALTHTECH (Oct. 30, 2019), https://healthtechmagazine.net/article/2019/10/what-happens-stolen-healthcare-data-perfcon .
[28] Brian Stack, *Here's How Much Your Personal Information Is Selling for on the Dark Web*, EXPERIAN (Dec. 6, 2017), https://www.experian.com/blogs/ask-experian/heres-how-much-your-personalinformation-is-selling-for-on-the-dark-web/.
[29] Paul Nadrag, *Industry Voices—Forget credit card numbers. Medical records are the hottest items on the dark web*, FIERCE HEALTHCARE (Jan. 26, 2021, 3:55 PM), https://www.fiercehealthcare.com/hospitals/industry-voices-forget-credit-card-numbers-medicalrecords-are-hottest-items-dark-web.
[30] *Fifth Annual Study on Medical Identity Theft*, PONEMON INSTITUTE (Feb. 2015), https://static.nationwide.com/static/2014_Medical_ID_Theft_Study.pdf?r=65 ("Ponemon Study").

identity thieves used the information to obtain fraudulent credit accounts, indicating that medical information is a much more profitable market.[31]

67.     According to the Ponemon study, "[t]hose who have resolved the crime spent, on average, more than 200 hours on such activities as working with their insurer or healthcare provider to make sure their personal medical credentials are secured and can no longer be used by an imposter and verifying their personal health information, medical invoices and claims and electronic health records are accurate."[32]

68.     Additionally, the study found that medical identity theft can have a negative impact on reputation as 45% of respondents said that medical identity theft affected their reputation mainly because of embarrassment due to disclosure of sensitive personal health conditions, with 19% responding that they missed out on employment opportunities as a result.[33]

69.     Exacerbating the problem, victims of medical identity theft oftentimes struggle to resolve the issue because HIPAA regulations require the victim to be personally involved in the resolution of the crime.[34] In some cases, victims may not even be able to access medical records using their personal information because they include a false name or data points taken from another person's records. Consequently, only 10% of medical identity theft victims responded that they "achiev[ed] a completely satisfactory conclusion of the incident."[35]

70.     Moreover, it can take months or years for victims to even discover they are the victim of medical-related identity theft or fraud given the difficulties associated with accessing medical records and healthcare statements. For example, the FTC notes that victims may only discover their identity has been compromised after they:

- Receive a bill for medical services they did not receive;

- Get contacted by a debt collector about medical debt they do not owe;

- See medical collection notices on their credit report that they do not recognize;

---

[31] *Id*. at 9.
[32] *Id*. at 2.
[33] *Id*. at 14.
[34] *Id*. at 1.
[35] *Id*.

- Find erroneous listings of office visits or treatments on their explanation of benefits (EOB);

- Receive information from their health plan that they have reached their limit on benefits; or

- Be denied insurance because their medical records show a condition they do not have.[36]

71.     Perhaps most dangerous, however, is the potential for misdiagnoses or treatment. According to Ann Patterson, a senior vice president of the Medical Identity Fraud Alliance, "About 20 percent of victims have told us that they got the wrong diagnosis or treatment, or that their care was delayed because there was confusion about what was true in their records due to the identity theft."[37] This echoes the Ponemon study, which notes that "many respondents are at risk for further theft or errors in healthcare records that could jeopardize medical treatments and diagnosis."[38]

72.     According to a Consumer Reports article entitled *The Rise of Medical Identity Theft*, this outcome "isn't a hypothetical problem" as the "long tail on medical identity theft can create havoc in victims' lives."[39] As one example, a pregnant woman reportedly used a victim's medical identity to pay for maternity care at a nearby hospital. When the infant was born with drugs in her system, the state threatened to take the *victim's* four children away—not realizing her identity had been stolen. The victim ultimately had to submit to a DNA test to remove her name from the infant's birth certificate, but it took years to get her medical records corrected.[40]

73.     Other types of medical fraud include "leveraging details specific to a disease or terminal illness, and long-term identity theft."[41] According to Tom Kellermann, "Traditional criminals understand the power of coercion and extortion. By having healthcare information—

---

[36] *Medical Identity Theft, FAQs for Health Care Providers and Health Plans*, FTC.GOV, https://www.ftc.gov/system/files/documents/plain-language/bus75-medical-identity-theft-faqhealth-care-health-plan.pdf  (last visited Feb. 22, 2024).
[37] Michelle Andrews, *The Rise of Medical Identity Theft*, CONSUMER REPORTS, https://www.consumerreports.org/medical-identity-theft/medical-identity-theft/  (last visited Feb. 22, 2024).
[38] Ponemon Study at 1.
[39] Michelle Andrews, *The Rise of Medical Identity Theft*, CONSUMER REPORTS, https://www.consumerreports.org/medical-identity-theft/medical-identity-theft/  (last visited Feb. 22, 2024).
[40] *Id*.
[41] Andrew Steger, *What Happens to Stolen Healthcare Data?*, HEALTHTECH (Oct. 30, 2019), https://healthtechmagazine.net/article/2019/10/what-happens-stolen-healthcare-data-perfcon

specifically, regarding a sexually transmitted disease or terminal illness—that information can be used to extort or coerce someone to do what you want them to do."[42] Long-term identity theft occurs when fraudsters combine a victim's data points, including publicly-available information or data points exposed in other data breaches, to create new identities, open false lines of credit, or commit tax fraud that can take years to remedy.

74. Many victims of the Data Breach have likely already experienced significant harms as the result of the Data Breach, including, but not limited to, medical-related identity theft and fraud. Plaintiffs and class members have also spent time, money, and effort dealing with the fallout of the Data Breach, including purchasing credit monitoring services, reviewing financial and healthcare statements, checking credit reports, and spending time and effort searching for unauthorized activity.

75. It is no wonder then that identity theft exacts a severe emotional toll on its victims. The 2017 Identity Theft Resource Center survey evidences the emotional suffering experienced by victims of identity theft:

- 75% of respondents reported feeling severely distressed;
- 67% reported anxiety;
- 66% reported feelings of fear related to personal financial safety;
- 37% reported fearing for the financial safety of family members;
- 24% reported fear for their physical safety;
- 15.2% reported a relationship ended or was severely and negatively impacted by the identity theft; and
- 7% reported feeling suicidal.[43]

76. Identity theft can also exact a physical toll on its victims. The same survey reported that respondents experienced physical symptoms stemming from their experience with identity theft:

- 48.3% of respondents reported sleep disturbances;

---

[42] *Id.*

[43] *Identity Theft: The Aftermath 2017*, ITRC, https://www.idtheftcenter.org/wpcontent/uploads/images/page-docs/Aftermath_2017.pdf (last visited Jan. 17, 2024).

- 37.1% reported an inability to concentrate / lack of focus;

- 28.7% reported they were unable to go to work because of physical symptoms;

- 23.1% reported new physical illnesses (aches and pains, heart palpitations, sweating, stomach issues); and

- 12.6% reported a start or relapse into unhealthy or addictive behaviors.[44]

77.     The unauthorized disclosure of the sensitive PHI to data thieves also reduces its inherent value to its owner, which has been recognized by courts as an independent form of harm.[45]

78.     Consumers are injured every time their data is stolen and traded on underground markets, even if they have been victims of previous data breaches. Indeed, the dark web is comprised of multiple discrete repositories of stolen information that can be aggregated together or accessed by different criminal actors who intend to use it for different fraudulent purposes. Each data breach increases the likelihood that a victim's personal information will be exposed to more individuals who are seeking to misuse it at the victim's expense.

79.     As the result of the wide variety of injuries that can be traced to the Data Breach, Plaintiffs and class members have and will continue to suffer economic loss and other actual harm for which they are entitled to damages, including, but not limited to, the following:

a.   the unconsented disclosure of confidential information to a third party;

b.   losing the value of the explicit and implicit promises of data security;

c.   identity theft and fraud resulting from the theft of their PHI;

d.   costs associated with the detection and prevention of identity theft and unauthorized use of their financial accounts;

e.   anxiety, emotional distress, and loss of privacy;

---

[44] *Id.*

[45] *See In re Marriott Int'l, Inc., Customer Data Sec. Breach Litig.*, 440 F. Supp. 3d 447, 462 (D. Md. 2020) ("Neither should the Court ignore what common sense compels it to acknowledge—the value that personal identifying information has in our increasingly digital economy. Many companies, like Marriott, collect personal information. Consumers too recognize the value of their personal information and offer it in exchange for goods and services.").

f.   costs associated with purchasing credit monitoring, credit freezes, and identity theft protection services;

g.   unauthorized charges and loss of use of and access to their financial and investment account funds and costs associated with inability to obtain money from their accounts or being limited in the amount of money they were permitted to obtain from their accounts, including missed payments on bills and loans, late charges and fees, and adverse effects on their credit;

h.   lowered credit scores resulting from credit inquiries following fraudulent activities;

i.   costs associated with time spent and the loss of productivity or the enjoyment of one's life from taking time to address and attempt to mitigate and address the actual and future consequences of the Data Breach, including searching for fraudulent activity, imposing withdrawal and purchase limits on compromised accounts, and the stress, nuisance, and annoyance of dealing with the repercussions of the Data Breach; and

j.   the continued, imminent, and certainly impending injury flowing from potential fraud and identify theft posed by their PHI being in the possession of one or many unauthorized third parties.

80.   Even in instances where an individual is reimbursed for a financial loss due to identity theft or fraud, that does not make that individual whole again as there is typically significant time and effort associated with seeking reimbursement.

81.   There may also be a significant time lag between when personal information is stolen and when it is misused for fraudulent purposes. According to the Government Accountability Office, which conducted a study regarding data breaches: "law enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web,

fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm."[46]

82.     Plaintiffs and class members place significant value in data security. According to a survey conducted by cyber-security company FireEye Mandiant, approximately 50% of consumers consider data security to be a main or important consideration when making purchasing decisions and nearly the same percentage would be willing to pay more in order to work with a provider that has better data security. Likewise, 70% of consumers would provide less personal information to organizations that suffered a data breach.[47]

83.     Because of the value consumers place on data privacy and security, healthcare providers with robust data security practices are viewed more favorably by patients and can command higher prices than those who do not. Consequently, had patients known the truth about American Vision's data security practices—that it did not adequately protect and store their PHI —they would not have sought medical care from partners affiliated with American Vision or would have paid significantly less. As such, Plaintiffs and Class members did not receive the benefit of their bargain with American Vision because they paid for the value of services they did not receive.

84.     Plaintiffs and Class members have a direct interest in American Vision's promises and duties to protect their PHI, *i.e.*, that American Vision *not increase* their risk of identity theft and fraud. Because American Vision failed to live up to its promises and duties in this respect, Plaintiffs and Class members seek the present value of identity protection services to compensate them for the present harm and present and continuing increased risk of harm caused by American Vision's wrongful conduct. Through this remedy, Plaintiffs and Class members seek to restore themselves and class members as close to the same position as they would have occupied but for American Vision's wrongful conduct, namely its failure to adequately protect Plaintiffs' and Class members' PHI.

---

[46] *PERSONAL INFORMATION: Data Breaches Are Frequent, but Evidence of Resulting Identity Theft is Limited; However, the Full Extent is Unknown*, GAO, http://www.gao.gov/new.items/d07737.pdf  (last visited Feb. 22, 2024).
[47] *BEYOND THE BOTTOM LINE: THE REAL COST OF DATA BREACHES*, FIREEYE, https://www2.fireeye.com/rs/848-DID-242/images/rpt-beyond-bottomline.pdf  (last visited Feb. 22, 2024).

85.     Plaintiffs and Class members further seek to recover the value of the unauthorized access to their PHI permitted through American Vision's wrongful conduct. This measure of damages is analogous to the remedies for unauthorized use of intellectual property. Like a technology covered by a trade secret or patent, use or access to a person's PHI is non-rivalrous— the unauthorized use by another does not diminish the rights-holder's ability to practice the patented invention or use the trade-secret protected technology. Nevertheless, a plaintiff may generally recover the reasonable use value of the IP—*i.e.*, a "reasonable royalty" from an infringer. This is true even though the infringer's use did not interfere with the owner's own use (as in the case of a non-practicing patentee) and even though the owner would not have otherwise licensed such IP to the infringer. A similar royalty or license measure of damages is appropriate here under common law damages principles authorizing recovery of rental or use value. This measure is appropriate because (a) Plaintiffs and class members have a protectible property interest in their PHI; (b) the minimum damages measure for the unauthorized use of personal property is its rental value; and (c) rental value is established with reference to market value, *i.e.*, evidence regarding the value of similar transactions.

86.     American Vision's deficient notice letter also caused Plaintiffs and Class members harm. For example, the objective of almost every data breach is to gain access to an organization's sensitive data so that the data can be misused for financial gain. Furthermore, the letter did not explain the precise nature of the attack, the identity of the hackers, or the number of individuals affected. American Vision's decision to withhold these key facts is significant because affected individuals may take different precautions depending on the severity and imminence of the perceived risk. By waiting months to disclose the Data Breach, American Vision prevented victims from taking meaningful, proactive, and targeted mitigation measures that could help protect them from harm.

87.     Because American Vision continues to hold the PHI of patients, Plaintiffs and Class members have an interest in ensuring that their PHI is secured and not subject to further theft.

## CLASS ACTION ALLEGATIONS

88.     Plaintiffs seek relief in their individual capacity and as representatives of all others who are similarly situated. Pursuant to Federal Rule of Civil Procedure 23, Plaintiffs bring this action on behalf of themselves and the Class defined as: All individuals whose personal health information was compromised in the Data Breach announced by American Vision in February 2024 (the "Class").

89.     Specifically excluded from the Class are Defendant; its officers, directors, or employees; any entity in which Defendant has a controlling interest; and any affiliate, legal representative, heir, or assign of Defendant. Also excluded from the Class are any federal, state, or local governmental entities, any judicial officer presiding over this action and the members of their immediate family and judicial staff, and any juror assigned to this action.

90.     Class Identity: The members of the Class are readily identifiable and ascertainable. Defendant and/or its affiliates, among others, possess the information to identify and contact class members.

91.     Numerosity: The members of the Class are so numerous that joinder of all of them is impracticable. American Vision's disclosures reveal that the Class contains nearly 2.4 million individuals whose PHI was compromised in the Data Breach.

92.     Typicality: Plaintiffs' claims are typical of the claims of the members of the Class because all class members had their PHI compromised in the Data Breach and were harmed as a result.

93.     Adequacy: Plaintiffs will fairly and adequately protect the interests of the Class. Plaintiffs have no known interest antagonistic to those of the Class and their interests are aligned with Class members' interests. Plaintiffs were subject to the same Data Breach as class members, suffered similar harms, and face similar threats due to the Data Breach. Plaintiffs have also retained competent counsel with significant experience litigating complex class actions, including data breach cases involving multiple classes and data breach claims.

94.     Commonality and Predominance: There are questions of law and fact common to the Class such that there is a well-defined community of interest in this litigation. These common

questions predominate over any questions affecting only individual class members. The common questions of law and fact include, without limitation:

    a.  Whether Defendant owed Plaintiffs and class members a duty to implement and maintain reasonable security procedures and practices to protect their PHI;

    b.  Whether Defendant received a benefit without proper restitution making it unjust for Defendant to retain the benefit without commensurate compensation;

    c.  Whether Defendant acted negligently in connection with the monitoring and/or protection of Plaintiffs' and class members' PHI;

    d.  Whether Defendant violated its duty to implement reasonable security systems to protect Plaintiffs' and class members' PHI;

    e.  Whether Defendant's breach of its duty to implement reasonable security systems directly and/or proximately caused damages to Plaintiffs and class members;

    f.  Whether Defendant adequately addressed and fixed the vulnerabilities that enabled the Data Breach;

    g.  Whether Plaintiffs and class members are entitled to damages to pay for future protective measures like credit monitoring and monitoring for misuse of medical information;

    h.  Whether Defendant provided timely notice of the Data Breach to Plaintiffs and class members; and

    i.  Whether class members are entitled to compensatory damages, punitive damages, and/or statutory or civil penalties as a result of the Data Breach.

95.    Defendant has engaged in a common course of conduct and Plaintiffs and class members have been similarly impacted by Defendant's failure to maintain reasonable security procedures and practices to protect patients' PHI, as well as Defendant's failure to timely alert affected customers to the Data Breach.

96.     Superiority: A class action is superior to other available methods for the fair and efficient adjudication of the controversy. Class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation. Absent a class action, most if not all class members would find the cost of litigating their individual claims prohibitively high and have no effective remedy. The prosecution of separate actions by individual class members would create a risk of inconsistent or varying adjudications with respect to individual class members and risk inconsistent treatment of claims arising from the same set of facts and occurrences. Plaintiffs know of no difficulty likely to be encountered in the maintenance of this action as a class action under the applicable rules.

## CLAIMS FOR RELIEF

## COUNT I

### Negligence

### *(On Behalf of Plaintiffs and the Class)*

97.     Plaintiffs repeat and reallege every allegation set forth in the preceding paragraphs.

98.     Defendant required Plaintiffs' and class members' PHI as a condition of receiving healthcare services and to perform Defendant's management services in connection with its practice partners providing medical treatment. Defendant collected and stored the data for purposes of providing medical treatment as well as for commercial gain.

99.     Defendant owed Plaintiffs and class members a duty to exercise reasonable care in protecting their PHI from unauthorized disclosure or access. Defendant acknowledged this duty in its Notice of Privacy Practices, where it promised not to disclose PHI without authorization and abide by all federal laws and regulations.

100.     Defendant owed a duty of care to Plaintiffs and class members to provide adequate data security, consistent with industry standards, to ensure that Defendant's systems and networks adequately protected the PHI.

101.     As a healthcare provider, Defendant had a special relationship with Plaintiffs and class members who entrusted Defendant to adequately safeguard their confidential personal, financial, and medical information.

102.     Defendant's duty to use reasonable care in protecting PHI arises as a result of the parties' relationship, as well as common law and federal law, including the HIPAA regulations described above and Defendant's own policies and promises regarding privacy and data security.

103.     Defendant knew, or should have known, of the risks inherent in collecting and storing PHI in a centralized location, Defendant's vulnerability to network attacks, and the importance of adequate security.

104.     Defendant breached its duty to Plaintiffs and class members in numerous ways, as described herein, including by:

a.   Failing to exercise reasonable care and implement adequate security systems, protocols, and practices sufficient to protect the PHI of Plaintiffs and class members;

b.   Failing to comply with industry standard data security measures for the healthcare industry leading up to the Data Breach;

c.   Failing to comply with its own privacy policies;

d.   Failing to comply with regulations protecting the PHI at issue during the period of the Data Breach;

e.   Failing to adequately monitor, evaluate, and ensure the security of Defendant's network and systems;

f.   Failing to recognize in a timely manner that PHI had been compromised; and

g.   Failing to timely and adequately disclose the Data Breach.

105.     Plaintiffs' and class members' PHI would not have been compromised but for Defendant's wrongful and negligent breach of its duties.

106.     Defendant's failure to take proper security measures to protect the sensitive PHI of Plaintiffs and class members as described in this Complaint, created conditions conducive to a foreseeable, intentional criminal act, namely the unauthorized access and copying of PHI by unauthorized third parties. Given that healthcare providers are prime targets for hackers, Plaintiffs and class members are part of a foreseeable, discernible group that was at high risk of having their PHI misused or disclosed if not adequately protected by Defendant.

107.    It was also foreseeable that Defendant's failure to provide timely and forthright notice of the Data Breach would result in injury to Plaintiffs and class members.

108.    As a direct and proximate result of Defendant's conduct, Plaintiffs and class members have and will suffer damages including: (i) the loss of rental or use value of their PHI; (ii) the unconsented disclosure of their PHI to unauthorized third parties; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, fraud, and/or unauthorized use of their PHI; (iv) lost opportunity costs associated with addressing and attempting to mitigate the actual and future consequences of the Data Breach, including, but not limited to, efforts spent researching how to prevent, detect, contest, and recover from fraud and identity theft; (v) time, effort, and expense associated with placing fraud alerts or freezes on credit reports; (vi) anxiety, emotional distress, loss of privacy, and other economic and non-economic losses; (vii) the continued risk to their PHI, which remains in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect it; (viii) future costs in terms of time, effort and money that will be expended to prevent, detect, contest, and repair the inevitable and continuing consequences of compromised PHI for the rest of their lives; and (ix) any nominal damages that may be awarded.

## COUNT II

### Negligence *Per Se*

### *(On Behalf of Plaintiffs and the Class)*

109.    Plaintiffs repeat and reallege every allegation set forth in the preceding paragraphs.

110.    As a healthcare provider, Defendant is covered by HIPAA, 45 C.F.R. § 160.102, and is therefore obligated to comply with all rules and regulations under 45 C.F.R. Parts 160 and 164.

111.    45 C.F.R. Part 164 governs "Security and Privacy," with Subpart A providing "General Provisions," Subpart B regulating "Security Standards for the Protection of Electronic Protected Health Information," Subpart C providing requirements for "Notification in the Case of Breach of Unsecured Protected Health Information," and Subpart E governing "Privacy of Individually Identifiable Health Information."

112. 45 C.F.R. § 164.104 states that the "standards, requirements, and implementation specifications adopted under this part" apply to covered entities and their business associates, such as Defendant.

113. Defendant is obligated under HIPAA to, among other things, "ensure the confidentiality, integrity, and availability of all electronic protected health information the covered entity or business associate creates, receives, maintains, or transmits" and "protect against any reasonably anticipated threats or hazards to the security or integrity of such information." 45 C.F.R. § 164.306.

114. 45 C.F.R. Sections 164.308 (Administrative safeguards), 164.310 (Physical safeguards), 164.312 (Technical safeguards), 164.314 (Organizational requirements), and 164.316 (Policies and procedures and documentation requirements) provide mandatory standards that all covered entities must adhere to.

115. Defendant violated HIPAA by failing to adhere to and meet the required standards as set forth in 45 C.F.R. §§ 164.308, 164.310, 164.312, 164.314, and 164.316.

116. Likewise, HIPAA regulations require covered entities "without unreasonable delay and in no case later than 60 calendar days after discovery of the breach" to "notify each individual whose unsecured protected health information has been, or is reasonably believed by the covered entity to have been, accessed, acquired, used, or disclosed as a result of" a data breach. 45 C.F.R. § 164.404. The notice must also contain a minimum amount of information regarding the breach (including the dates of the breach and its discovery), the types of protected health information that were involved, steps individuals should take to protect themselves from harm resulting from the breach, a description of what the entity is doing to investigate the breach and mitigate harm, and contact information to obtain further information. *Id.*

117. Defendant breached its notification obligations under HIPAA by failing to give timely and complete notice of the breach to Plaintiffs and class members.

118. HIPAA requires Defendant to "reasonably protect" confidential data from "any intentional or unintentional use or disclosure" and to "have in place appropriate administrative, technical, and physical safeguards to protect the privacy of protected health information." 45

C.F.R. § 164.530(c)(1). The confidential data at issue in this case constitutes "protected health information" within the meaning of HIPAA.

119.    HIPAA further requires Defendant to disclose the unauthorized access and theft of the PHI to Plaintiffs and class members "without unreasonable delay" so that they can take appropriate measures to mitigate damages, protect against adverse consequences, and detect misuse of their PHI. See 45 C.F.R. § 164.404.

120.    Defendant violated HIPAA by failing to reasonably protect Plaintiffs' and class members' PHI and by failing to give timely and complete notice, as described herein.

121.    Defendant's violations of HIPAA constitute negligence *per se*.

122.    Plaintiffs and class members are within the class of persons that HIPAA and its implementing regulations were intended to protect.

123.    The harm that occurred as a result of the Data Breach is the type of harm HIPAA was intended to guard against.

124.    Additionally, Section 5 of the Federal Trade Commission Act ("FTC Act") prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by businesses, such as Defendant, of failing to use reasonable measures to protect PHI. 15 U.S.C. § 45(a)(1).

125.    The FTC publications and orders described above also form part of the basis of Defendant's duty in this regard.

126.    Defendant violated Section 5 of the FTC Act by failing to use reasonable measures to protect PHI and failing to comply with applicable industry standards. Defendant's conduct was unreasonable given the nature and amount of PHI they obtained, stored, and disseminated in the regular course of their business, and the foreseeable consequences of a data breach, including, specifically, the significant damage that would result to Plaintiffs and class members.

127.    Defendant's violations of Section 5 of the FTC Act constitute negligence *per se*.

128.    Plaintiffs and class members are within the class of persons that the FTC Act was intended to protect.

129.    The harm that occurred as a result of the Data Breach is the type of harm the FTC Act was intended to guard against. The FTC has pursued enforcement actions against businesses, which, as a result of their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm as that suffered by Plaintiffs and class members. As a direct and proximate result of Defendant's negligence *per se*, Plaintiffs and class members sustained actual losses and damages as alleged herein. Plaintiffs and class members alternatively seek an award of nominal damages.

## COUNT III

### Breach of Third-Party Beneficiary Contract

### *(On Behalf of Plaintiffs and the Class)*

130.    Plaintiffs repeat and reallege every allegation set forth in the preceding paragraphs.

131.    Acting in the ordinary course of business, American Vision contracts with ophthalmologist practices to provide management services. American Vision obtains patients' PHI received from its partners, like Barnet and Southwestern, to perform its management services.

132.    Upon information and belief, each of those respective contracts contained provisions requiring American Vision to protect the patient information that American Vision received in order to provide such management services in carrying out the business of the Partnership.

133.    Upon information and belief, these provisions requiring American Vision acting in the ordinary course of business to protect the personal information of patients were intentionally included for the direct benefit of Plaintiffs and class members, such that Plaintiffs and class members are intended third party beneficiaries of these contracts, and therefore entitled to enforce them.

134.    Defendant breached these contracts while acting in the ordinary course of business by not protecting Plaintiffs' and class member's personal information, as stated herein.

135.    As a direct and proximate result of Defendant's breaches, Plaintiffs and class members sustained actual losses and damages described in detail herein. Plaintiffs and class members alternatively seek an award of nominal damages.

**<u>COUNT IV</u>**

**Unjust Enrichment**

***(On Behalf of Plaintiffs and the Class)***

136.    Plaintiffs repeat and reallege every allegation set forth in the preceding paragraphs.

137.    Plaintiffs and class members have an interest, both equitable and legal, in their PHI that was conferred upon, collected by, and maintained by the Defendant and which was stolen in the Data Breach. This information has independent value.

138.    Plaintiffs and class members conferred a monetary benefit on Defendant in the form of payments for medical and healthcare services, including those paid indirectly by Plaintiffs and class members to Defendant.

139.    Defendant appreciated and had knowledge of the benefits conferred upon it by Plaintiffs and class members.

140.    The price for medical and healthcare services that Plaintiffs and class members paid (directly or indirectly) to Defendant should have been used by Defendant, in part, to pay for the administrative costs of reasonable data privacy and security practices and procedures.

141.    Likewise, in exchange for receiving Plaintiffs' and class members' valuable PHI, which Defendant was able to use for their own business purposes and which provided actual value to Defendant, Defendant was obligated to devote sufficient resources to reasonable data privacy and security practices and procedures.

142.    As a result of Defendant's conduct, Plaintiffs and class members suffered actual damages as described herein. Under principals of equity and good conscience, Defendant should be compelled to disgorge into a common fund for the benefit of Plaintiffs and class members all unlawful or inequitable proceeds they received from Plaintiffs and class members, including damages equaling the difference in value between medical and healthcare services that included implementation of reasonable data privacy and security practices that Plaintiffs and class members paid for and the services without reasonable data privacy and security practices that they actually received.

**COUNT V**

**Declaratory Judgment**

*(On Behalf of Plaintiffs and the Class)*

143.    Plaintiffs repeat and reallege every allegation set forth in the preceding paragraphs.

144.    Under the Declaratory Judgment Act, 28 U.S.C. §§ 2201, *et seq*., this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and grant further necessary relief. Furthermore, the Court has broad authority to restrain acts, such as here, that are tortious and violate the terms of the federal statutes described in this Complaint.

145.    An actual controversy has arisen in the wake of the Data Breach regarding Defendant's present and prospective common law and other duties to reasonably safeguard PHI and whether Defendant is currently maintaining data security measures adequate to protect Plaintiffs and class members from further cyberattacks and data breaches that could compromise their PHI.

146.    Defendant still possesses PHI pertaining to Plaintiffs and class members, which means their PHI remains at risk of further breaches because Defendant's data security measures remain inadequate. Plaintiffs and class members continue to suffer injuries as a result of the compromise of their PHI and remain at an imminent risk that additional compromises of their PHI will occur in the future.

147.    Pursuant to the Declaratory Judgment Act, Plaintiffs seek a declaration that: (a) Defendant's existing data security measures do not comply with its obligations and duties of care; and (b) in order to comply with their obligations and duties of care, (1) Defendant must have policies and procedures in place to ensure the parties with whom it shares sensitive personal information maintain reasonable, industry-standard security measures, including, but not limited to, those listed at (ii), (a)-(i), *infra*, and must comply with those policies and procedures; (2) Defendant must: (i) purge, delete, or destroy in a reasonably secure manner Plaintiffs' and class members' PHI if it is no longer necessary to perform essential business functions so that it is not subject to further theft; and (ii) implement and maintain reasonable, industry-standard security measures, including, but not limited to:

a. Engaging third-party security auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on Defendant's systems on a periodic basis, and ordering Defendant to promptly correct any problems or issues detected by such third-party security auditors;

b. Engaging third-party security auditors and internal personnel to run automated security monitoring;

c. Auditing, testing, and training its security personnel regarding any new or modified procedures;

d. Encrypting PHI and segmenting PHI by, among other things, creating firewalls and access controls so that if one area of Defendant's systems is compromised, hackers cannot gain access to other portions of its systems;

e. Purging, deleting, and destroying in a reasonable and secure manner PHI not necessary to perform essential business functions;

f. Conducting regular database scanning and security checks;

g. Conducting regular employee education regarding best security practices;

h. Implementing multi-factor authentication and POLP to combat system-wide cyberattacks; and

i. Routinely and continually conducting internal training and education to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and the Class set forth herein, respectfully requests the following relief:

A.    That the Court certify this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, appoint Plaintiffs as class representatives and Plaintiffs' counsel as Class Counsel;

B.    That the Court grant permanent injunctive relief to prohibit and prevent Defendant

from continuing to engage in the unlawful acts, omissions, and practices described herein;

C.      That the Court award Plaintiffs and class members compensatory, consequential, and general damages, including nominal damages as appropriate, for each count as allowed by law in an amount to be determined at trial;

D.      That the Court award statutory damages, trebled, and/or punitive or exemplary damages, to the extent permitted by law;

E.      That the Court order disgorgement and restitution of all earnings, profits, compensation, and benefits received by Defendant as a result of their unlawful acts, omissions, and practices;

F.      That Plaintiffs be granted the declaratory and injunctive relief sought herein;

G.      That the Court award to Plaintiffs the costs and disbursements of the action, along with reasonable attorneys' fees, costs, and expenses; and

H.      That the Court award pre-and post-judgment interest at the maximum legal rate and all such other relief as it deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a jury trial in the instant action.

Dated: February 27, 2024

By:/s/ *Elaine A. Ryan*
Elaine A. Ryan (AZ Bar #012870)
**AUER RYAN, P.C.**
20987 N. John Wayne Parkway, #B104-374
Maricopa, AZ 85139
Telephone: (520) 7005-7332
eryan@auer-ryan.com

Norman E. Siegel*
J. Austin Moore*
Stefon J. David*
**STUEVE SIEGEL HANSON LLP**
460 Nichols Road, Suite 200
Kansas City, Missouri 64112
Telephone: (816) 714-7100
siegel@stuevesiegel.com

1

moore@stuevesiegel.com
david@stuevesiegel.com
2

*Pro Hac Vice Forthcoming*

3

*Counsel for Plaintiffs and the Class*

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28